# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 22-0282V**

DERMOTT WHALEN,

Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,

Respondent.

Chief Special Master Corcoran

Filed: July 22, 2026

*Laura Levenberg, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Katherine Carr Esposito, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On March 11, 2022, Dermott Whalen filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine he received on September 16, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

Because the parties could not informally resolve the issue of entitlement, Petitioner filed a Motion for Ruling on the Record and a Brief in Support of Damages. For the

[1] Because this Ruling/Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling/Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

reasons set forth below, I find that Petitioner is entitled to compensation. In addition, I award Petitioner $130,000.00, in pain and suffering, and $3,544.8 (uncontested), for his past unreimbursable expenses.

## I. Procedural History

This claim was initiated on March 11, 2022, and relevant medical records were filed thereafter. ECF No. 1-7. On September 12, 2023, Respondent filed his Vaccine Rule 4(c) report stating that this case was not appropriate for compensation. ECF No. 23. On December 18, 2023, I issued a preliminary ruling, finding that Petitioner received the flu vaccine in his right shoulder, as alleged. ECF No. 24. I encouraged the parties to resolve this case, but they were unable to do so. Petitioner filed a Motion for Ruling on the Record and Brief in Support of Damages ("Mot.") on September 16, 2024. ECF No. 37. Respondent filed Response to Petitioner's Motion ("Opp.") on November 20, 2024, ECF No. 39. Petitioner filed a Reply on December 20, 2024 ("Reply"). This matter is now ripe for adjudication.

## II. Relevant Medical History

A complete recitation of the facts can be found in the medical records, the Petition, declarations and affidavits, and in the parties' respective briefings. In summary, Mr. Whalen was a 67-year-old consultant at the time he received a flu vaccine on September 16, 2020, at a CVS Pharmacy located in Bronxville, NY. Petitioner's Exhibit ("Ex.") 1 at 3. His medical history was significant for a "shoulder strain" of unspecified laterality in June 2018, although no further detail was provided. Ex. 2 at 7. In addition, on September 24, 2018, Mr. Whalen reported left shoulder pain, which he related to muscular pain from swimming. *Id*. at 9. The treating physician at the time opined that this pain was likely due to exercise, and not arthritis. *Id*. at 11. Petitioner's pre-vaccination history was otherwise unremarkable.

The vaccination record states that Mr. Whalen received the flu vaccine in his left deltoid on September 16, 2020. Ex. 1 at 3. In his affidavit, however, Mr. Whalen states that:

> [w]hen I went to the local CVS Pharmacy on Bronx River Road to get my annual flu shot[,] the Pharmacist who gave the vaccination was busy with many patients in the pharmacy area, and I had to wait for 15 minutes in the shot area. When she came to give me the shot[,] I told her that I was left-handed and wanted to get the shot in my right arm.

> I always get flu shots in the right arm and she said she understood and adjusted her position to the right arm. Immediately after received the shot[,] I felt an usual sharp pain in the upper part of my arm.

Ex. 5 at 1.

On September 29, 2020, 13 days after his vaccination, Mr. Whalen went to rheumatologist Bruce Solitar, M.D., with complaints of right shoulder pain. Ex. 2 at 40. The notes from this visit state:

> The patient complains of pain in the right shoulder. 2 weeks ago he received a flu vaccine to the right deltoid. Shortly after the injection he noted pain in the right shoulder. The shoulder feels stiff. There is tenderness in the subacromial area. He has difficulty lifting the arm…

*Id*. On exam, Mr. Whalen displayed decreased range of motion ("ROM") and tenderness over the subacromial region in his right shoulder. *Id*. at 44. Dr. Solitar assessed Mr. Whalen with right subdeltoid bursitis and rotator cuff tendinitis, "likely related to the influenza vaccine injection." *Id*. Dr. Solitar administered a steroid injection into the subacromial space of Petitioner's right shoulder. *Id*. Mr. Whalen was instructed to return if his symptoms worsened. *Id*.

On October 29, 2020, Mr. Whalen underwent a right shoulder MRI, which revealed the presence of calcium hydroxyapatite deposits in the infraspinatus and supraspinatus tendons, rotator cuff tendinosis with a partial-thickness tear, and glenohumeral joint and acromioclavicular arthrosis. Ex. 2 at 66.

The following day (October 30, 2020), Mr. Whalen returned to Dr. Solitar complaining of continued right shoulder pain. Ex. at 46. Petitioner reported that a prior steroid injection initially provided pain relief and improved mobility, but his shoulder pain gradually returned over the next week. *Id*. On exam, Mr. Whalen continued to exhibit decreased ROM and tenderness over the subacromial region of his right shoulder. *Id*. at 49. Dr. Solitar's assessment remained subdeltoid bursitis and rotator cuff tendinitis "likely related to the influenza injection. This has been reported a number of times likely related to injection of flu vaccine in or near the bursa." *Id*. Dr. Solitar noted that Petitioner's right shoulder MRI showed calcification, which raised the possibility of calcific tendinitis; nevertheless, Dr. Solitar stated that "I suspected this is not the primary cause of his current symptoms." *Id*.

On November 5, 2020, Mr. Whalen received an ultrasound-guided steroid injection into his right subacromial/subdeltoid bursa. Ex. 6 at 205. The preprocedural ultrasound

findings found “mild fluid distention and thickening of the subacromial/subdeltoid bursa, compatible with bursitis. There is also a 1.2 cm focal calcification in the subscapularis tendon, partially extending into the subacromial/subdeltoid bursa, compatible with calcific tendinitis.” *Id*.

Approximately three months later, on February 16, 2021, Mr. Whalen saw orthopedist Mandeep Virk, M.D. reporting right shoulder pain. Ex. 3 at 6. Petitioner stated that his symptoms began a “few months” prior, and he rated his pain as 6-9/10. *Id*. Dr. Virk also noted that Mr. Whalen had “some symptoms of cervical radiculopathy.” *Id*. On exam, Mr. Whalen was tender over the anterior joint line and bicipital groove of his right shoulder, and he had positive impingement signs. *Id*. at 10. Dr. Virk diagnosed Mr. Whalen with right shoulder calcific tendinitis, partial rotator cuff tear, subacromial bursitis and impingement, and biceps tendinosis. *Id*. Dr. Virk also discussed multiple options for further treatment, including surgery. *Id*. at 11. Specifically, Dr. Vick noted the following:

> Dermott has had a fair trial of non-surgical treatment directed towards this specific diagnosis, which included time, anti-inflammatory medications, injections, and physical therapy. However, his right shoulder symptoms are not getting better and interfering with his sleep and activities of daily living. The shoulder pain and dysfunction is significantly limiting patients activities at home and at play and recreation.
>
> His options are:
>
> 1. Continue with the non-surgical management consisting of PT, anti-inflammatory medications, and intermittent corticosteroid injection.
>
> 2. Surgical options A. Right shoulder arthroscopy, debridement of calcific deposits with rotator cuff debridement vs repair, subacromial decompression, biceps tendinosis and intraarticular debridement.

*Id*. at 11. Mr. Whalen stated that he wanted to discuss the options with his wife. *Id*. During a follow-up telehealth appointment on March 4, 2021, Mr. Whalen decided to proceed with surgery. *Id*. at 12, 14.

On March 17, 2021, six months after receiving the relevant vaccination, Mr. Whalen underwent right shoulder arthroscopy, including rotator cuff repair, open proximal biceps tenodesis, subacromial decompression and acromioplasty, and debridement. Ex. 3 at 19-23. The postoperative diagnoses included right shoulder rotator cuff tear, significant subacromial bursitis with subacromial spur, calcific tendinitis overlying the

supraspinatus, biceps tendon and infraspinatus, biceps tendinitis, impingement syndrome, labral tear, and chondral wear. *Id*.

On March 30, 2021, Mr. Whalen returned to Dr. Virk for his first post-operative visit. Ex. 3 at 25. Petitioner was wearing a sling and reported "well controlled" pain. *Id*. Mr. Whalen's incisions were healing well, his sutures were removed, and he received a physical therapy ("PT") referral. *Id*.

The next day (March 31, 2021), Mr. Whalen went for an initial PT evaluation at New York – Presbyterian Lawrence Hospital. Ex. 4 at 10. Petitioner reported that he experienced the "sudden onset" of right shoulder pain following a flu vaccination on September 16, 2020. *Id*. During his examination, Mr. Whalen rated his pain as 1-2/10, and he displayed decreased ROM and strength of his right shoulder. *Id*. at 10-11. Physical therapy was prescribed twice weekly for 12 weeks. *Id*.

From March 31 to June 7, 2021, Mr. Whalen completed a total of 32 post-operative PT sessions. Ex. 4 at 5-9, 14-15. Over the course of his treatment, Petitioner experienced improvements in pain and his ROM. *Id*. at 14-15. By June 7, 2021, Mr. Whalen rated his pain at a 0/10 and reported that he was easily able to complete his activities of daily life. *Id*. at 14.

On June 8, 2021, Mr. Whalen returned to Dr. Virk for a follow-up appointment regarding his right shoulder pain, three months after his March 2021 surgery. Ex. 3 at 27. Petitioner reported that he "rarely [experienced] pain anymore[,] and his ROM ha[d] improved." *Id*. Dr. Virk noted that Mr. Whalen was doing well. *Id*. He advised Petitioner to continue PT and use over-the-counter anti-inflammatory medication as needed. *Id*. Petitioner also returned to Dr. Virk for follow-up on August 10, 2021, and his condition was unchanged. *Id*. at 28.

On September 9, 2021, almost one year after vaccination, Mr. Whalen saw Dr. Solitar for back pain. Ex. 2 at 59. Petitioner reported that he no longer had any shoulder pain and on exam, he exhibited good ROM in both shoulders, without pain. *Id*. at 59, 63. Petitioner has not filed any subsequent medical records regarding his shoulder.

Mr. Whalen detailed in his declaration the extenuating circumstances during the time that he was experiencing his shoulder injury. He stated that, as of August 12, 2024, he continued to perform an exercise program three times a week at the Presbyterian Sports Performance facility where he works on strength and range of motion exercises. Ex. 8 at 3. Mr. Whalen stated that he continues to experience a decreased range of motion of his right shoulder, scar tissue, and soreness. *Id*. His shoulder injury has negatively impacted on his ability to play golf. *Id*.

## III. Applicable Law

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs*., 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs*., 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs*., No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined.

*Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## IV. Analysis

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

[3] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g*. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

## V. Factual Findings Regarding a Table SIRVA

Respondent has contested only one issue in Mr. Whalen's case – situs of vaccination. After a review of the entire record, and as set forth below, I find that a preponderance of the evidence support's Petitioner's contention of a right-sided vaccination – and all other Qualifications and Aids to Interpretation ("QAI") requirements for a Table SIRVA are met.

Respondent notes that the vaccination record states that Petitioner received the flu vaccine to his *left* deltoid, and that Petitioner's medical records indicate that he is ambidextrous, undercutting his contention that he is left-hand dominant and received the vaccine to his right shoulder. *Id*. at 6-8. At the same time, however, Petitioner *reported* right shoulder pain a mere 13 days after vaccination, specifically stating that he received the vaccination in his right shoulder. Ex. 2 at 40. The timeframe is short enough to infer that Petitioner remembered in which shoulder he received the vaccine, despite what the administration record says.

In every record thereafter, Petitioner consistently reported right shoulder pain associated with the vaccination. And he received all treatment to his right shoulder, including an MRI which showed rotator cuff tendinosis (Ex. 2 at 66), and all Petitioner's medical providers evaluated and diagnosed right shoulder symptoms. He received surgery to his right deltoid, and all post-operative physical therapy was conducted on the right deltoid. There is no other record (other than the record of vaccination) to the contrary. *See* e.g., Ex. 2 at 40-44; Ex. 2 at 66 (right deltoid MRI); Ex. 6 at 205 (cortisone injection

to right deltoid); Ex. 4 at 1-10 (physical therapy records), Ex. 3 at 19-20 (records of arthroscopic surgery); Ex. 3 at 6-14, 25-28, 59-63 (orthopedic records).

Overall, this combination of evidence outweighs the initial vaccine administration (and the contention a left-sided administration occurred finds no other corroboration in the record).

*a. Other Requirements*

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). The overall record contains preponderant evidence to fulfill these additional requirements.

As I have found above, the record shows that Petitioner received a flu vaccine intramuscularly in his right shoulder on October 20, 2020. Ex. 1 at 3; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for his injury. Petition at 5; Section 11(c)(1)(E) (lack of prior civil award). Therefore, Petitioner has satisfied all requirements for a Table SIRVA.

The last criterion which must be satisfied by Petitioner involves the duration of his SIRVA. For compensation to be awarded, the Vaccine Act requires that a petitioner suffer the residual effects of his or her left shoulder injury for more than six months or required surgical intervention. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Starting from October 2, 2020 (24 hours after vaccination), the records undoubtedly demonstrate that Petitioner suffered the residual effects of his shoulder injury for more than six months. *See*, *e.g.*, Ex. 4 at 14 (June 7, 2021 discharge from physical therapy). Thus, this requirement is also met.

Based upon all of the above, Petitioner has established that he suffered a Table SIRVA. Additionally, he has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## VI. <u>Damages</u>

### a. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include an award "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may

recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no precise formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

A special master may also look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in each case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

### b. Parties' Arguments

#### i. Petitioner

Mr. Whalen has requested $140,000.00 in pain and suffering. Mot. at 11. He states that he reported his injury just 13 days after vaccination, and that his treatment consisted of visits to his primary care provider and orthopedist, a total of 32 sessions of PT sessions

(post-operative), two cortisone injections, an MRI, and ultimately arthroscopic surgery. Mot. at 10.

Petitioner cites three comparable decisions to support his requested award: (1) *Bryant v. Sec'y of Health & Human Servs*., No. 21-2241V, 2024 WL 1739776 (Fed. Cl. Spec. Mstr. March 20, 2024), (2) *Jahn v. Sec'y of Health & Human Servs.*, No. 18-0613, 2021 WL 6550870 (Fed. Cl. Spec. Mstr. Dec. 17, 2021), and (3) *Anglewicz v. Sec'y of Health & Human Servs*., No. 20-1504, 2024 WL 2702415 (Fed. Cl. Spec. Mstr. Feb. 8, 2024). Mr. Whalen adds that after his surgery, his arm had to remain in a brace and sling which left him unable to drive, dress and bathe. Ex. 8 at 2. He states that the post-operative pain he experienced was significant and impacted on both his confidence and emotional well-being. *Id*. Additionally, Petitioner testified that he still experiences soreness, weakness, and a decreased range of motion to this day. *Id*.

**c. Respondent**

Respondent argues that Petitioner suffered a "mild-to-moderate" injury, and should therefore be awarded an amount consistent with cases with similar injuries. Opp. at 12-20. In that respect, Respondent proposes an award for pain in suffering in the amount of $55,000.00. *Id*.

Respondent argues that Petitioner's course of treatment was less severe that the claimants who received amounts closer to Petitioner's demand. Opp. at 17. Additionally, Mr. Whalen experienced a relatively mild to moderate course, with primary resolution of his symptoms within nine months after vaccination and within three months after his surgery. Thus, a departure from the typical six-figure pain and suffering award for surgical SIRVA cases is warranted. *Id*.

Notably, Respondent does not cite any specific case to support his proposed award of $55,000.00. Rather, he distinguishes the cases cited by Petitioner, and then states, in conclusory fashion, that I should "award a pain and suffering amount well below" three cases he cites - *Richardson, Weed*, and *Shelton*.[4] Opp. at 17.

[4] *Richardson v. Sec'y of Health & Human Servs,* No. 20-0674V, 2023 WL 6180813, *1, *3-6 (Fed. Cl. Spec. Mstr. Aug. 16, 2023); *Weed v. Sec'y of Health & Human Servs*., No. 181473, 2021 WL 1711800 (Fed. Cl. Spec. Mstr. Mar. 30, 2021); *Shelton v. Sec'y of Health & Human Servs*., No. 19-279, 2021 WL 2550093, at *7-8 (Fed. Cl. Mstr. May 21, 2021).

## VII. Appropriate Compensation in this SIRVA Case

### a. Pain and Suffering

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[5]

In this case, awareness of the injury is not disputed. The record reflects that at all times, Mr. Whalen was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of his injury. When performing this analysis, I review the same record relied upon to determine entitlement, including the filed affidavits and medical records, and written briefs. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases.

The record establishes that Mr. Whalen suffered a moderate SIRVA injury, albeit in the context of an injury requiring surgery. His treatment course consisted of PCP and orthopedic visits, two cortisone injections (one was ultrasound guided), an MRI, 32 PT visits (post-operative), an MRI, and a surgical procedure (arthroscopic surgery). I also note that Mr. Whalen was seen very quickly for his injury, just 13 days post-vaccination. Ex. 2 at 40-45. By June 2021, approximately eight months after vaccination, Mr. Whalen reported that he "rarely [experienced] pain anymore[,] and his ROM ha[d] improved." Ex. 3 at 27.

Respondent argues that the *Richardson, Weed,* and *Shelton* cases are good comparables to Mr. Whalen's case, justifying the proposed award of $55,000.00 for pain and suffering. Opp. at 15. However, I do not find any of the cases cited by Respondent to be appropriate comparable cases, as (with the exception of *Shelton*), they did not involve surgery. And *Shelton* stands as one of the only cases in the Program where a petitioner was awarded less than six figures for his pain and suffering, but it involved unique circumstances that the average "SIRVA surgery" claim does not present. *Shelton v. Sec'y of Health & Human Servs.*, No. 19-279, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21,

---

[5] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

2021).[6] Thus, these cases are unpersuasive and will not be considered in my analysis for Mr. Whalen's pain and suffering award.

Petitioner cites three cases in support of his request for $140,000.00 in pain and suffering – *Bryant, Jahn,* and *Anglewicz*. In his Reply, Petitioner provides a chart, identifying the number of days between vaccination and the initial presentation to a medical provider for treatment of the shoulder, the number of steroid injections the petitioner received, the number of physical therapy appointments each petitioner completed, the number of MRIs each petitioner underwent, and the number of surgical procedures. Reply at 2-3. While this information is helpful and demonstrates the similarities between these cases and Mr. Whalen's experience, one important factor is missing from this chart -- the duration of the injury, i.e., the length of treatment, as well as how long each petitioner endured SIRVA symptoms.

This missing information is highly relevant. In *Bryant*, for example, a petitioner's SIRVA treatment spanned three years (with some treatment gaps). *Bryant,* 2024 WL 1739776 at *7. The *Jahn* petitioner suffered a moderate SIRVA injury for eight months, then became pregnant and did not seek treatment for her SIRVA again until her daughter was approximately 17 months old. *Jahn,* 2021 WL 6550870 at *5-6. She then underwent arthroscopic surgery and last sought treatment for her SIRVA nearly one year after surgery – with her total SIRVA injury spanning more than four years after vaccination. *Id*. In *Anglewicz*, by contrast, the petitioner suffered a moderately severe SIRVA for approximately 10 months, by which point she had achieved at least a substantial recovery. *Anglewicz*, 2024 WL 2702415, *5.

The duration of a SIRVA injury is an important factor in determining an appropriate award for pain and suffering. A SIRVA may resolve quickly even if it involves high pain levels, thus impacting the amount of pain and suffering that a particular individual may endure. On the other hand, a petitioner may have a milder SIRVA injury that persists for years. In these circumstances, an award for pain and suffering may actually be higher than a more severe injury that resolves quickly, because the petitioner will have to adjust his or her life in the longer term to accommodate for the shoulder injury. In balancing these factors, the duration of the injury must be considered.

Thus, of the cases cited by Petitioner, I find that this case is most similar to *Anglewicz,* where a claimant was awarded $130,000.00 for her pain and suffering. *Anglewicz*, 2024 WL 2702415, *5. That petitioner initially sought treatment 25 days after her vaccination, underwent an MRI, two steroid injections, and eventually required

---

[6] Inexplicably, Respondent's proposed award for pain and suffering is nowhere near the amount even awarded in *Shelton* (which involved an award fairly close to the $100,000.00 informal benchmark).

arthroscopic surgery. *Id*. She had one post-operative physical therapy session before switching to a home exercise program. *Id*. She stopped treatment after 10 months. *Id*.

Like the *Anglewicz* petitioner, Mr. Whalen reported his injury quickly, just 13 days after vaccination, supporting the conclusion that his pain was severe. His treatment consisted of visits to his primary care provider and orthopedist, a total of 32 sessions of PT sessions, one cortisone injection, and an arthroscopic shoulder surgery. Mot. at 26-27. While the *Anglewicz* petitioner had a slightly longer treatment period, Mr. Whalen did undergo substantially more PT sessions. In addition, both petitioners had extenuating circumstances during their injury (both injuries took place during the COVID-19 Pandemic), making their courses particularly difficult to navigate. Thus, although not identical, I find the *Anglewicz* case to be a very persuasive comparison to Mr. Whalen's claim.

Under such circumstances, and considering the arguments presented by both parties, a review of the cited cases, and based on the record as a whole, I find that **$130,000.00,** in compensation for Mr. Whalen's past pain and suffering is reasonable and appropriate in this case.

### b. Past Unreimbursable Expenses

The parties have agreed that Petitioner has submitted preponderant evidence to support $3,544.81in past out-of-pocket medical expenses related to his shoulder injury, and I shall award that amount. Opp. at 20.

## CONCLUSION

Based on my consideration of the complete record as a whole and for the reasons discussed above, pursuant to Section 12(d)(3)(A), **I find that $130,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[7] **I also award Petitioner $3,544.81 for his past out of pocket medical expenses. Accordingly, I award Petitioner a lump sum payment of $133,544.81, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner**. This amount represents compensation for all

[7] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[8]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

[8] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.